UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAYMOND MANZANILLO,

Plaintiff,

v.

JOHN MOULTON, et al.,

Defendants.

Case No.  13-cv-02174-JST (PR)

**ORDER DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION; GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; ADDRESSING PENDING MOTIONS**

Dkt. # 51, 52, 56, 60, 64, 68, 73, 81, 82, 83

## INTRODUCTION

On May 13, 2013, plaintiff, a state prisoner incarcerated at Pelican Bay State Prison ("PBSP"), filed this pro se civil rights action pursuant to 42 U.S.C. § 1983, alleging constitutional violations by PBSP staff.  The operative pleading is plaintiff's Second Amended Complaint ("SAC").  The Court screened the SAC on January 6, 2014 and determined that it stated claims for excessive force, retaliation, and denial of due process.  The Court ordered service on defendants John Moulton ("Moulton"), a staff psychologist at PBSP, and J. Frisk ("Frisk"), a sergeant at PBSP.

Now before the Court are: (1) plaintiff's motion for reconsideration of the Court's January 6, 2014 screening order, and (2) defendants' motion for summary judgment.[1]

_____

[1] Plaintiff has also filed three separate motions to compel discovery as well as a motion to supplement one of the three motions to compel.  He does not, however, seek to stay summary judgment pending ruling on plaintiff's discovery motions, pursuant to Federal Rule of Civil

United States District Court
Northern District of California

**BACKGROUND**

The following facts are undisputed except where otherwise indicated:

Plaintiff has been in solitary confinement at PBSP's Security Housing Unit ("SHU") since 2001. (Pl. Decl. ¶ 2.)  At all times relevant to the events described in the SAC, plaintiff had a pending civil rights action alleging excessive force by various PBSP officials. (Pl. Decl. ¶ 5.)  In the weeks leading up to the August 31, 2011 incident described below, plaintiff had also filed several administrative grievances against PBSP staff members. (Zamora Decl. Exs. B, C; Torrance Decl. Ex. B.)  In particular, on July 19, 2011, plaintiff submitted a health care grievance against several members of PBSP's health care staff, claiming that they were harassing him and not appropriately documenting his complaints that he was suffering from stress. (Torrance Decl. Ex. A, Dkt. No. 60-15 at 36-38.)  Among other things, plaintiff claimed that he had been harassed by the SHU psychiatrist/psychologist doing his routine rounds on June 27, 2011.[2] (Dkt. No. 60-15 at 38.)

Several weeks later, on August 26, 2011, PBSP nursing staff referred plaintiff for a mental health evaluation on the grounds that he had "submitted [a grievance] expressing paranoia." (Moulton Decl. ¶ 3 & Ex. A.)  Later that day, Moulton met with plaintiff while plaintiff was in a holding cell in SHU's D-clinic waiting to see his primary care physician. (Moulton Decl. ¶ 4; Pl. Decl. ¶ 14.)  Moulton told plaintiff that nursing staff had referred him for a mental health evaluation, but plaintiff denied that he was suffering from any mental health issues and thus refused the evaluation. (SAC ¶ 29; Moulton Decl. Ex. C, Dkt. No. 60-17, at 6.)  Plaintiff alleges also that during this encounter he told Moulton that an evaluation would be a conflict of interest for Moulton because Moulton was part of the grievance he had filed. (SAC ¶ 29; Pl. Decl. ¶ 16.)

Procedure 56(d) (formerly Rule 56(f)).  Although plaintiff originally filed a Rule 56(d) request (see dkt. no. 72), he subsequently withdrew the request and proceeded to file his opposition to summary judgment (see dkt. nos. 78, 79).  Accordingly, the summary judgment motion is now submitted, and the Court will proceed to rule on it herein.

[2] Chapter 14 of PBSP's Mental Health Policies and Procedures provides that "[a]t least once every other week a psychologist, psychiatrist, or licensed social worker will make visual and verbal contact with each inmate housed in the SHU and review housing unit records . . . for information indicating change in level of functioning or signs and symptoms of mental illness." Pl. Decl. Ex. 16 at 6 (alteration in original).

After plaintiff refused the mental health evaluation, Moulton reviewed plaintiff's prison records and wrote his impressions on a form labeled "Chronological Interdisciplinary Progress Notes." (Moulton Decl. ¶¶ 5-6 & Ex. C, Dkt. No. 60-17, at 6-7.)  According to his notes, on the morning of August 26, 2011, Moulton was approached by the nursing supervisor, who expressed concerns about a grievance submitted by plaintiff on July 19, 2011 "complaining about one of the SHU nurses and the D-SHU physician." (Dkt. No. 60-17 at 6.)  Describing the content of the grievance, Moulton wrote:

> The complaint essentially alleged that medical staff were not appropriately documenting [plaintiff's] medical concerns and complaints of stress.  This was further alleged to be a means of creating confusion, as well as harassing him.  [Plaintiff] also stated in the complaint staff were trying to "humiliate, embarrass, and create emotional distress."  There was also mention that it had been stated that his "aunts are bisexual."  The end of the [grievance] alleged that all of this was intended to interfere with and obstruct his pending litigation.

(Dkt. No. 60-17 at 6.)  Moulton's description of plaintiff's grievance did not include plaintiff's allegation that he had been harassed by the SHU psychiatrist/psychologist doing his routine rounds on June 27, 2011.

Moulton also consulted with the D-SHU physician, who told him that she had unsuccessfully tried to get plaintiff to speak to Moulton.  (Dkt. No. 60-17 at 6.)  Regarding their consultation, Moulton wrote:

> It was . . . clear that his presentation to her (and to me) was inconsistent with someone with a major psychotic illness.  He is most certainly not suffering from schizophrenia.  There is no evidence of auditory hallucinations, affective flattening, alogia, oddness, disorganization and so forth that would go along with that diagnosis.

(Dkt. No. 60-17 at 6.)

Nevertheless, after reviewing plaintiff's C-File (Central File), Moulton found that the content of some of plaintiff's grievances was suspect.  (Dkt. No. 60-17 at 7.)  Specifically, plaintiff's grievances dated June 21, 2011 and July 14, 2011 alleged that custody officers were monitoring two inmates in his unit for sexual misconduct via the use of infrared and/or plethysmograph technology.  (Dkt. No. 60-17 at 7.)  Moulton also saw a grievance alleging that some members of the health care staff were questioning plaintiff's sexual orientation.  (Dkt. No.

United States District Court
Northern District of California

60-17 at 7.)

Given the content of plaintiff's grievances, Moulton could not understand why custody officers had not previously seen the need to refer plaintiff for mental health services. (Dkt. No. 60-17 at 7.) Summing up his review of plaintiff's records, Moulton wrote:

> We have an individual who is overly concerned with sexuality (there is too much mention of this throughout the record), expresses the belief that others are questioning his sexual identity, and is frequently stating what would be described as paranoid ideation. In addition, there is the frequent request for record reviews and his overtly litigious nature, both of which are consistent with paranoia. This observation, combined with the expressed concerns about (homo [or bi]) sexuality, makes it all seem as though it is a case of "protesting too much." However, without the benefit of a full evaluation, a diagnosis cannot be made (or not made).

(Dkt. No. 60-17 at 7.)

Notwithstanding his concerns, however, and after consulting with his supervisor, Moulton found that there was no basis for forcing an evaluation on plaintiff and that the criteria for referring plaintiff to the Psychiatric Services Unit ("PSU") for evaluation were not met. (Dkt. No. 60-17 at 7.) Moulton's last notes were that medical staff needed to "keep an eye" on plaintiff and that plaintiff's case would be discussed at the next IDTT (Interdisciplinary Treatment Team) meeting scheduled for September 8, 2011. (Dkt. No. 60-17 at 7.)

According to Moulton, both Moulton's supervisor and PBSP's Higher Level of Care Coordinator determined during an additional review of plaintiff's case that plaintiff should be referred to the PSU for an extended evaluation and observation. (Moulton Decl. ¶ 7.) The determination was consistent with Chapter 8, Volume 1 of PBSP's "Mental Health Policies and Procedures" which requires that "SHU I/Ps [Inmates/Patients] suspected of having one or more of [the SHU exclusionary conditions] shall be placed in the PSU within 96 hours." (Moulton Decl. ¶ 7 & Ex. D.) "Paranoia is often a symptom of a psychotic disorder which is, by definition, grounds for exclusion from Pelican Bay's SHU." (Id.)

Plaintiff was neither consulted nor notified beforehand about the referral decision. (Pl. Decl. ¶ 18.) On August 31, 2011, Moulton, IDTT leader Dr. Rushe, and Chief of Mental Health Dr. Germain signed a mental health placement chrono referring plaintiff to the PSU. (Moulton Decl. ¶ 8 & Ex. E.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Later that day, Facility D Program Sergeant Frisk was informed that plaintiff needed to be

2   moved from SHU to the PSU for an observation period. (Frisk Decl. ¶ 5.)  At around 2:20 p.m.,

3   Frisk arrived at plaintiff's cell and ordered plaintiff to pack up his property because PBSP doctors

4   had referred him to the PSU for evaluation. (Frisk Decl. ¶ 5.)  However, plaintiff refused to pack

5   up his belongings or submit to restraints so that he could be moved to the PSU. (Frisk Decl. ¶ 5.)

6   Frisk then left plaintiff's cell, telling plaintiff that he would be back in half an hour to extract him

7   if plaintiff continued to refuse to move to the PSU. (Frisk Decl. ¶ 5; Pl. Decl. ¶ 23.)

8   At around 2:30 p.m., Moulton's supervisor received a phone call indicating that Moulton

9   was needed to attempt a clinical intervention with plaintiff prior to cell extraction. (Soderlund

10   Decl. Ex. A., Dkt. No. 60-10 at 2.)  Moulton arrived at plaintiff's cell at around 2:59 p.m. and

11   attempted to persuade plaintiff to voluntarily leave his cell and submit to evaluation at the PSU.

12   (Dkt. No. 60-10 at 2.)  However, plaintiff declined to cooperate, telling Moulton that he had a

13   right to refuse treatment. (Pl. Decl. ¶ 24; Moulton Decl. Ex. F.)  Plaintiff alleges also that he told

14   Moulton, "You know this is retaliation.  I don't have any mental health issues, nor am I a threat to

15   anybody." (Pl. Decl. ¶ 24.)  After spending approximately five minutes at plaintiff's cell, Moulton

16   determined that clinical intervention was unsuccessful and consequently left. (Frisk Decl. Ex. A at

17   2; Moulton Decl. Ex. F.)

18   At around 3:15 p.m., the cell extraction team assembled and introduced themselves on

19   camera. (Frisk Decl. Ex. A at 2; Clemons Decl. Ex. A ("DVD of Cell Extraction") at 00:00-

20   01:40.)[3]  The team then proceeded to plaintiff's cell, where Lieutenant Williams read plaintiff a

21   use of force advisory, warning him that physical force would be used to remove him from his cell

22   if he refused to comply. (Frisk Decl. Ex. A at 2; DVD of Cell Extraction at 01:41-04:50.)

23   Plaintiff again refused to leave his cell, asserting that he had the right to refuse and that the order

24   to transfer him to the PSU was retaliation for the lawsuit he had filed. (Pl. Decl. ¶ 30; DVD of

25   Cell Extraction at 04:30-38.)  Frisk then dropped one Oleoresin Capsicum Vapor aerosol grenade

26   ("OCV grenade") into plaintiff's cell through the cell's food port, and plaintiff began coughing

27   _____

28   [3]  Defendants have provided a DVD recording of the cell extraction, which the Court has
    reviewed.

5

United States District Court
Northern District of California

1   from its effects a few seconds later.  (Frisk Decl. Ex. A at 2; Pl. Decl. ¶ 32; DVD of Cell

2   Extraction at 04:48-05:15.)  Approximately thirty-five seconds after the first OCV grenade was

3   dropped, and after ordering plaintiff to cuff up several times, Frisk dropped a second OCV

4   grenade into plaintiff's cell.  (Frisk Decl. Ex. A at 2; DVD of Cell Extraction at 05:06-41.)  Almost

5   immediately after the second OCV grenade was dropped, plaintiff fell to his knees and positioned

6   himself next to the toilet.  (Pl. Decl. ¶ 34; DVD of Cell Extraction at 05:41-50.)  Frisk continued to

7   order plaintiff to cuff up, and, within a few minutes, plaintiff began to comply with the extraction

8   process.  (Frisk Decl. Ex. A at 2; DVD of Cell Extraction at 05:41-06:55.)

9       After plaintiff was removed from his cell, the extraction team escorted him to a shower for

10  decontamination.  (Frisk Decl. Ex. A at 2; DVD of Cell Extraction at 10:23-13:50.)  Once there,

11  plaintiff was decontaminated by having cool water run over his head for approximately three

12  minutes.  (Frisk Decl. Ex. A at 2; DVD of Cell Extraction at 14:27-17:18.)  The cell extraction

13  team's licensed vocational nurse then conducted a brief medical examination of plaintiff and

14  concluded he had no injuries.  (Frisk Decl. Ex. A at 2; DVD of Cell Extraction at 17:27-45.)

15  Lieutenant Williams then terminated the video recording.  (DVD of Cell Extraction at 17:47-55.)

16      Once plaintiff reached the PSU, he was placed in the EOP (Enhanced Outpatient Program).

17  (Pl. Decl. ¶ 38.)  Some of the inmates there threw feces and urine at those they could reach, and

18  the building was constantly loud as a result of the yelling and banging of doors by the inmates.

19  (Id.)  All of this made it very difficult for plaintiff to adjust to the PSU and sleep soundly.  (Id.)

20      During his stay at the PSU, plaintiff was asked to participate in various forms of

21  psychological testing and numerous clinical sessions with his assigned clinician, Dr. Rich, so that

22  she could assess his mental well-being.  (Pl. Decl. ¶¶ 39-40.)  Plaintiff felt compelled to participate

23  in the program and cooperate fully with Dr. Rich because he feared that if he did not comply he

24  would never be taken off the Mental Health Services Delivery System ("MHSDS").  (Pl. Decl. ¶

25  39.)

26      On September 20, 2011, Dr. Rich met with plaintiff for a one-on-one session and reviewed

27  the results of plaintiff's psychological tests with him.  (Pl. Decl. Ex. 10.)  During that session, they

28  also discussed the possible implications of plaintiff's return to the SHU and the stigma that mental

1   health carries.  (Id.)  Dr. Rich recorded in her notes that plaintiff was aware of the comments and

2   questions he might receive as a result of his stay at the PSU, but that he did not "endorse any

3   increase in anxiety, fearfulness, or concerns for his well-being if returned to the SHU."  (Id.)

4       At the end of plaintiff's PSU evaluation period, Dr. Rich produced an initial psychological

5   evaluation report.  (Pl. Decl. Ex. 1.)  In the report, Dr. Rich stated that although some of plaintiff's

6   thought content tended to be persecutory, it was not delusional or bizarre.  (Pl. Decl. Ex. 1 at 4.)

7   Moreover, she found no evidence of an underlying major mental illness and thus no basis for

8   plaintiff to be placed in the MHSDS at any level.  (Pl. Decl. Ex. 1 at 6-7.)  She therefore

9   recommended that plaintiff be housed in a manner appropriate for his correctional behavior

10  without regard to mental health needs.  (Id. at 7.)

11      On September 28, 2011, plaintiff's IDTT signed a mental health removal chrono

12  discharging plaintiff from the MHSDS.  (Pl. Decl. Ex. 12.)  Several days later, plaintiff was finally

13  returned to the SHU, having spent a total of thirty-five days in the PSU.  (Pl. Decl. ¶¶ 41-42.)

14                              **DISCUSSION**

15  **I.     Plaintiff's Motion for Reconsideration of Court's January 6, 2014 Order**

16      In his proposed SAC, plaintiff sought to add retaliation claims against Christine

17  McAllister-Silva ("McAllister-Silva"), a licensed vocational nurse at PBSP, as well as

18  supervisorial liability claims against CDCR Director Matthew Cate ("Cate").  Specifically,

19  plaintiff alleged that "McAllister-Silva assisted Pelican Bay officials in retaliating against plaintiff

20  because plaintiff's pending lawsuit contained allegations that McAllister-Silva participated in a

21  cover-up."  (SAC at 6.)  The Court dismissed the claims against McAllister-Silva on the ground

22  that plaintiff did not state how McAllister-Silva assisted in the retaliation.  (Dkt. No 41 at 3-4.)

23      With regard to Cate, plaintiff alleged that, after plaintiff filed a staff complaint, Cate failed

24  to conduct an investigation as required by CDCR procedures.  (SAC at 17.)  The Court dismissed

25  the claims against Cate on the ground that plaintiff failed to allege a violation of a constitutional

26  right or of federal law. (Dkt. No 41 at 4.)  The Court advised plaintiff that CDCR policy is not

27  federal law and failure to follow internal procedure does not violate any constitutional right or

28  other provision of federal law cited by plaintiff or known to the Court.  (Id.)  The Court advised

United States District Court
Northern District of California

7

plaintiff that further leave to amend would not be granted because plaintiff had already amended twice and further amendment appeared to be futile.

Plaintiff has filed a motion for reconsideration of the Court's January 6, 2014 Order dismissing McAllister-Silva and Cate from the action. Motions for reconsideration are governed by Civil Local Rule 7-9, which, at the time plaintiff filed his motion, stated:

> (a)  Leave of Court Requirement.  Before the entry of a judgment adjudicating all of the claims and the rights and liabilities of all the parties in a case, any party may make a motion before a Judge requesting that the Judge grant the party leave to file a motion for reconsideration of any interlocutory order made by that Judge on any ground set forth in Civil L.R. 7-9 (b).  No party may notice a motion for reconsideration without first obtaining leave of Court to file the motion.
>
> (b)  Form and Content of Motion for Leave.  A motion for leave to file a motion for reconsideration must be made in accordance with the requirements of Civil L.R. 7-9.  The moving party must specifically show:
>
> > (1)  That at the time of the motion for leave, a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought.  The party also must show that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the interlocutory order; or
> >
> > (2)  The emergence of new material facts or a change of law occurring after the time of such order; or
> >
> > (3)  A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order.
>
> (c)  Prohibition Against Repetition of Argument. No motion for leave to file a motion for reconsideration may repeat any oral or written argument made by the applying party in support of or in opposition to the interlocutory order which the party now seeks to have reconsidered.  Any party who violates this restriction shall be subject to appropriate sanctions.

Civ. L.R. 7-9(a)-(c) (Jan. 2014) (emphasis added).

In violation of the Local Rules, plaintiff failed first to seek leave of court before filing his motion for reconsideration.  On that basis alone, the motion will be denied.  Tri-Valley CARES v. U.S. Dept. of Energy, 671 F.3d 1113, 1131 (9th Cir. 2012) ("Denial of a motion as the result of a

United States District Court
Northern District of California

1   failure to comply with local rules is well within a district court's discretion.").  The fact that

2   plaintiff is pro se does not excuse his non-compliance with the procedural rules of this Court.  See

3   Ghazali v. Moran, 46 F.3d 52, 54 (9th Cir. 1995).

4        Moreover, plaintiff's motion fails to make the showing required under Civil Local Rule 7-9

5   or otherwise to show good cause for reconsideration.  In short, plaintiff disagrees with the Court's

6   ruling and merely repeats arguments which the Court has already considered and rejected.  See

7   Civ. L.R. 7-9(c); Fuller v. M.G. Jewelry, 950 F.2d 1437, 1442 (9th Cir. 1991) ("Treating the

8   motion for reconsideration as one brought under Rule 59(e), the trial court did not abuse its

9   discretion in denying the motion, because the [plainitffs] presented no arguments which the court

10  had not already considered and rejected.").  Plaintiff's motion for reconsideration will therefore be

11  denied.

12  **II.    Defendants' Motion for Summary Judgment**

13        **A.    Standard of Review**

14        Summary judgment is proper where the pleadings, discovery and affidavits show there is

15  "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

16  law."  See Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case.

17  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is

18  genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving

19  party.  See id.

20        A court shall grant summary judgment "against a party who fails to make a showing

21  sufficient to establish the existence of an element essential to that party's case, and on which that

22  party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an

23  essential element of the nonmoving party's case necessarily renders all other facts immaterial."

24  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the initial

25  burden of identifying those portions of the record that demonstrate the absence of a genuine issue

26  of material fact.  Id.  The burden then shifts to the nonmoving party to "go beyond the pleadings

27  and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

28  file,' designate 'specific facts showing that there is a genuine issue for trial.'"  See id. at 324 (citing

1   Fed. R. Civ. P. 56(e) (amended 2010)).

2       For purposes of summary judgment, the court must view the evidence in the light most

3   favorable to the nonmoving party; if the evidence produced by the moving party conflicts with

4   evidence produced by the nonmoving party, the court must assume the truth of the evidence

5   submitted by the nonmoving party.  See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir.

6   1999).  The court's function on a summary judgment motion is not to make credibility

7   determinations or weigh conflicting evidence with respect to a disputed material fact.  See T.W.

8   Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

9       A district court may only consider admissible evidence in ruling on a motion for summary

10  judgment.  See Fed. R. Civ. P. 56(e); Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002).

11  Here, plaintiff has verified his SAC and his declaration in opposition to defendants' motion for

12  summary judgment by signing both documents under penalty of perjury, and, for purposes of the

13  instant order, the Court construes those documents as affidavits in opposition to defendants'

14  motion.  See Schroeder v. McDonald, 55 F.3d 454, 460 & n.10 (9th Cir. 1995) (finding complaint

15  signed under penalty of perjury constituted admissible evidence).

16      **B.      Excessive Force Claim against Defendant Frisk**

17      Plaintiff claims that Frisk's use of force during the August 31, 2011 cell extraction violated

18  his Eighth Amendment right to be free from cruel and unusual punishment.

19          **1.      Standard**

20      In order to state a claim for the use of excessive force in violation of the Eighth

21  Amendment, plaintiff must allege facts that, if proven, would establish that prison officials applied

22  force "maliciously and sadistically to cause harm," rather than in "a good-faith effort to maintain

23  or restore discipline." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).  The extent of injury suffered

24  by an inmate is one of the factors to be considered in determining whether the use of force is

25  wanton and unnecessary.  Id.  Not every malevolent touch by a prison guard gives rise to a federal

26  cause of action; the Eighth Amendment's prohibition of cruel and unusual punishment necessarily

27  excludes from constitutional recognition the de minimis uses of physical force.  Id. at 9-10.

28  Guards may use force only in proportion to the need for it in each situation.  Spain v. Procunier,

1    600 F.2d 189, 195 (9th Cir. 1979).

2          In determining whether the use of force was for the purpose of maintaining or restoring

3    discipline or, rather, for the malicious and sadistic purpose of causing harm, a court may evaluate

4    the need for the application of force, the relationship between that need and the amount of force

5    used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials,

6    and any efforts made to temper the severity of a forceful response.   Hudson, 503 U.S. at 7;

7    LeMaire v. Maass, 12 F.3d 1444, 1454 (9th Cir. 1993); see also Spain, 600 F.2d at 195 (guards

8    may use force only in proportion to need in each situation); see, e.g., Watts v. McKinney, 394

9    F.3d 710, 712 (9th Cir. 2005) (finding that kicking the genitals of a prisoner who was on the

10   ground and in handcuffs during an interrogation was "near the top of the list" of acts taken with

11   cruel and sadistic purpose to harm another); Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002)

12   (pepper-spraying fighting inmates a second time after hearing coughing and gagging from prior

13   spray was not malicious and sadistic for purpose of causing harm, where initial shot of spray had

14   been blocked by inmates' bodies).  Courts must, however, accord prison administrators wide-

15   ranging deference in the adoption and execution of policies and practices to further institutional

16   order and security.  Bell v. Wolfish, 441 U.S. 520, 547 (1979); Jeffers v. Gomez, 267 F.3d 895,

17   917 (9th Cir. 2001).

18              **2.      Discussion**

19         Applying the Hudson factors here, the Court finds that plaintiff fails to create a genuine

20   dispute of material fact as to whether Frisk maliciously and sadistically used force against plaintiff

21   for the purpose of causing harm.

22         First, Frisk was justified in using at least some force against plaintiff.  Frisk had been given

23   an order to transfer plaintiff to the PSU, but plaintiff refused to voluntarily submit to handcuffs or

24   leave his cell.  Frisk was therefore entitled to use reasonable force to extract plaintiff from his cell.

25   See Soto v. Dickey, 744 F.2d 1260, 1267 (7th Cir. 1984) (rejecting argument that correctional

26   officers can "wait out" prisoners who refuse to obey orders because "experience and common

27   sense establish that a prison cannot be operated in such a way").

28         Second, the amount of force used was commensurate with the need for force.  The

United States District Court
Northern District of California

California Department of Corrections and Rehabilitation Department Operations Manual ("CDCR DOM") clearly contemplates the use of chemical agents, including OCV grenades, during controlled use of force incidents such as cell extractions, see CDCR DOM §§ 51020.12, 51020.12.3, 51020.15, 51020.15.1, and the incident reports indicate that Frisk was forced to use two OCV grenades because plaintiff continued to refuse to cuff up even after the first OCV grenade was deployed.  (Decl. of Soderlund Ex. A at 4, 6-7, 8, 15.)  On this record, the facts do not evince a malicious and sadistic purpose.  See Whitley v. Albers, 475 U.S. 312, 321-22 (1986) ("'Prison administrators  . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'") (quoting Bell v. Wolfish, 441 U.S. at 547); Spain, 600 F.2d at 195 (finding that the use of tear gas in small amounts on a prisoner who has refused to move from his cell after adequate warning may be "a legitimate means for preventing small disturbances from becoming dangerous to other inmates or the prison personnel"); Gaddy v. Solis, No. C 11-5568 PJH (PR), 2013 WL 5202590, at *4 (N.D. Cal. Sep. 16, 2013) (characterizing the deployment of two pepper spray grenades during a cell extraction as a "rather small" and "minor" use of force).

Third, plaintiff's injuries were relatively minor.  Plaintiff claims that he suffered pain in his lungs and that the coughing he experienced exacerbated rib injuries from a stabbing incident several weeks prior.  (Pl. Decl. ¶ 35.)  Though not de minimis, plaintiff's injuries are nonetheless minor enough as to weigh against a finding that the force was applied maliciously and sadistically for the purpose of causing harm.  Moreover, in Hudson, the court focused on whether the slight nature of the injury inflicted could defeat an Eighth Amendment claim, rather than whether an extreme injury always meant the force was excessive.  See Hudson, 503 U.S. at 7.  This one factor is not dispositive and does not overcome the fact that all the other factors weigh heavily in favor of a finding that the force used was necessary under the circumstances.

Fourth, the evidence is undisputed that a threat was reasonably perceived by Frisk.  Specifically, Frisk perceived a threat to the safety and security of the prison and to compliance with prison policy.  (Frisk Decl. ¶¶ 13-14.)  Frisk was responding to a referral from mental health

staff to move plaintiff to the PSU.  The referral was based on the fact that plaintiff had been exhibiting signs of paranoia.  Frisk understood that PSU referrals were based on legitimate concern for the inmates, the necessity for treatment, and the safety of the institution.  (Id. ¶ 14.) Despite several attempts to gain compliance, plaintiff refused to abide by Frisk's authorized orders to submit to restraints and move to the PSU.  Conceding to plaintiff would have posed a threat to discipline and order at the prison, see Soto, supra at 1267, as well as to the possible safety of plaintiff himself.

Fifth, Frisk attempted to temper the severity of his force by giving plaintiff almost an hour to decide whether he would comply after plaintiff refused Frisk's initial verbal order to prepare to leave his cell.  (Frisk Decl. ¶¶ 5-7.)  In addition, Moulton attempted a clinical intervention prior to cell extraction in an effort to avoid the use of force.  (Id. ¶ 6.)  Finally, the force used was tempered by permitting plaintiff to decontaminate with cool water for several minutes, and by having a nurse immediately examine plaintiff for injuries.  See Furnace v. Sullivan, 705 F.3d 1021, 1030 (9th Cir. 2013) (finding that prison staff tempered the severity of their forceful response by allowing the plaintiff to decontaminate and by giving him medical treatment).

Viewing the evidence in the light most favorable to plaintiff, no reasonable jury could determine that Frisk deployed the OCV grenades against plaintiff maliciously and sadistically for the purpose of causing harm.  Plaintiff therefore fails to create a genuine dispute of material fact as to whether the force used against him was excessive.  Accordingly, Frisk is entitled to summary judgment on plaintiff's excessive force claim.[4]

---

[4] In addition to addressing plaintiff's excessive force claim on the merits, defendants also argue that the Heck favorable termination rule bars plaintiff's claim for excessive force because success on plaintiff's claim would necessarily imply the invalidity of plaintiff's disciplinary hearing finding that plaintiff had violated a prison rule by resisting Frisk's orders.  See Heck v. Humphrey, 512 U.S. 477, 486-87 (1994).  However, the Heck favorable termination rule "does not apply to § 1983 suits challenging a disciplinary hearing or administrative sanction that does not affect the overall length of the prisoner's confinement."  Ramirez v. Galaza, 334 F.3d 850, 858 (9th Cir. 2003). Although plaintiff originally lost ninety days' worth of good time credits as a result of his rule violation, thereby bringing him within the ambit of Heck, he has now presented evidence that his credits have been restored.  (See Dkt. No. 82.)  Plaintiff's second motion to supplement his opposition to present evidence that his credits have been restored (Dkt. No. 82) is hereby GRANTED.  The Heck issue is therefore moot.

United States District Court
Northern District of California

### C.     Excessive Force Claim against Defendant Moulton for Failure to Intervene

Plaintiff claims that Moulton is also liable for Frisk's alleged use of excessive force under a failure to intervene theory.

#### 1.     Standard

Liability may be imposed on an individual defendant under § 1983 if the plaintiff can show that the defendant proximately caused the deprivation of a federally protected right.  See Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988); Harris v. City of Roseburg, 664 F.2d 1121, 1125 (9th Cir. 1981).  A person deprives another of a constitutional right within the meaning of § 1983 if he does an affirmative act, participates in another's affirmative act or omits to perform an act which he is legally required to do, causing the deprivation of which the plaintiff complains.  See Leer, 844 F.2d at 633.  A prison official's failure to intervene to prevent a constitutional violation may form the basis for such liability.  See Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir. 1995). However, in order to state an excessive force claim against a correctional officer bystander, a plaintiff must allege circumstances demonstrating that the officer had an opportunity to intervene and prevent or curtail the violation, but failed to do so.  Id.

#### 2.     Discussion

The Court has already determined that Frisk did not use excessive force against plaintiff. Plaintiff's claim that Moulton failed to intervene in Frisk's alleged use of excessive force therefore fails.  Even assuming that Frisk's use of force was excessive, Moulton was not present at plaintiff's cell at the time of the cell extraction and thus had no reasonable opportunity to intervene. Furthermore, and continuing with the same assumption, although Moulton was present at plaintiff's cell only a few minutes before the cell extraction began, Moulton could not have known that excessive force would be used to extract plaintiff from his cell.  There was thus no reason for Moulton to remain at plaintiff's cell to prevent the alleged use of excessive force.  Accordingly, Moulton is entitled to summary judgment on plaintiff's excessive force claim.

### D.     Retaliation Claim against Defendant Moulton

Plaintiff claims that Moulton violated his First Amendment right to free speech by harassing him and referring him to the PSU for a mental health evaluation in retaliation for

14

1   plaintiff's filing of grievances and a prior civil rights action.

2                    **1.       Standard**

3          Retaliation by a state actor for the exercise of a constitutional right is actionable under

4   § 1983.  Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-84 (1977).  Within

5   the prison context, a viable claim of First Amendment retaliation entails five basic elements:

6   "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3)

7   that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First

8   Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."

9   Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).

10         The prisoner need not demonstrate a total chilling of his First Amendment rights in order

11  to establish a retaliation claim.  See Rhodes, 408 F.3d at 568-69 (rejecting argument that inmate

12  did not state a claim for relief because he had been able to file inmate grievances and a lawsuit).

13  That a prisoner's First Amendment rights were chilled, though not necessarily silenced, is enough.

14  Id. at 569.  To prove retaliation, a plaintiff must show that the defendant took adverse action

15  against him that "would chill or silence a person of ordinary firmness from future First

16  Amendment activities."  White v. Lee, 227 F.3d 1214, 1228 (9th Cir. 2000) (citing Mendocino

17  Envtl. Ctr. v. Mendocino Cnty., 192 F.3d 1283, 1300 (9th Cir. 1999)).

18         A prisoner's § 1983 retaliation claim must rest on proof that he was retaliated against for

19  exercising his constitutional rights and that the retaliatory action advanced no legitimate

20  penological interest.  See Hines v. Gomez, 108 F.3d 265, 267 (9th Cir. 1997).  The prisoner bears

21  the burden of pleading and proving the absence of legitimate correctional goals for the conduct of

22  which he complains.  Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995).

23         Retaliation claims brought by prisoners must be evaluated in light of concerns over

24  "excessive judicial involvement in day-to-day prison management, which 'often squander[s]

25  judicial resources with little offsetting benefit to anyone.'"  Pratt, 65 F.3d at 807 (alteration in

26  original) (quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)).  In particular, courts should

27  "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered

28  legitimate penological reasons for conduct alleged to be retaliatory."  Id. (quoting Sandin, 515

United States District Court
Northern District of California

15

1    U.S. at 482).

2                   **2.    Discussion**

3           Plaintiff alleges two separate acts of retaliation by Moulton.  First, plaintiff alleges that

4    Moulton retaliated against him for "initiating and maintaining a civil rights lawsuit . . . by

5    harassing [him] with provocative comments."  (SAC ¶ 60.)  Second, plaintiff alleges that Moulton

6    further retaliated against him for filing a grievance about Moulton's alleged harassment by

7    "arbitrarily diagnosing him with a nonexistent serious mental disorder that required a designation

8    into the [EOP] program at the [PSU]."  (Id.)

9           Plaintiff's retaliation claim fails with respect to Moulton's alleged harassment because the

10   only specific act of harassment identified by plaintiff would be insufficient to chill or silence a

11   person of ordinary firmness from future First Amendment activities.  Plaintiff alleges that "[o]n

12   June 27, 2011 while making his routine staff psychologist rounds in the SHU, Moulton walked

13   past [his] cell, looked in [his] direction and called [him] a 'coward.'"  (SAC ¶ 24.)  Even accepting

14   the allegation as true, it is apparent that such an act of verbal harassment, standing alone, would

15   not chill a person of ordinary firmness from exercising protected speech.  Cf. Coszalter v. City of

16   Salem, 320 F.3d 968, 976 (9th Cir. 2003) (holding that when an employer's would-be retaliatory

17   action against an employee "includes only minor acts, such as 'bad-mouthing,' that cannot

18   reasonably be expected to deter protected speech, such acts do not violate an employee's First

19   Amendment rights").  Moreover, there is an absence of evidence that Moulton was substantially

20   motivated to harass plaintiff "because of" plaintiff's protected conduct.  Plaintiff fails to provide

21   any evidence showing that Moulton was even aware of plaintiff's prior civil rights action.  Finally,

22   "'[v]erbal harassment or abuse . . . is not sufficient to state a constitutional deprivation under 42

23   U.S.C. § 1983.'"  Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir.1987) (quoting Collins v.

24   Cundy, 603 F.2d 825, 827 (10th Cir.1979)); see, e.g., Keenan v. Hall, 83 F.3d 1083, 1092 (9th Cir.

25   1996), amended 135 F.3d 1318 (9th Cir. 1998) (disrespectful and assaultive comments by prison

26   guard not enough to implicate Eighth Amendment).

27          Plaintiff's retaliation claim also fails with respect to his transfer to the PSU.  First, the

28   undisputed evidence shows that Moulton did not take any adverse action against plaintiff.  The

United States District Court
Northern District of California

undisputed evidence shows that the decision to move plaintiff to the PSU was not made by

Moulton at all, but rather by Moulton's supervisor and PBSP's Higher Level of Care Coordinator.

Indeed, the decision to refer plaintiff to the PSU was made in spite of Moulton's determination that

a referral to the PSU was not necessary.  Thus, even assuming that plaintiff's July 19, 2011

grievance was directed partly against Moulton and that Moulton knew this,[5] the evidence does not

show that Moulton harbored a retaliatory animus against plaintiff.  Further, plaintiff fails to create

a genuine dispute of material fact as to whether the transfer served a legitimate correctional goal.

At the time of plaintiff's transfer, the PBSP Mental Health Policies and Procedures provided that

"SHU I/Ps suspected of having one or more of [the exclusionary] conditions shall be placed in the

PSU within 96 hours."  (Moulton Decl. Ex. D at 3 (emphasis added).)  While plaintiff's grievances

might not have been sufficient grounds for a diagnosis of mental illness, they were sufficient to

give rise to a suspicion that plaintiff might be suffering from mental illness.  See Mateo v. Fischer,

682 F. Supp. 2d 423, 434-35 (S.D.N.Y. 2010) (finding that a prisoner's complaint detailing

experiences of harassment, retaliation, and threats by prison officials could lead a reasonable

person to believe that a referral for a mental health evaluation was justified).  Plaintiff's transfer

was thus not only authorized but required by PBSP regulations.  Plaintiff does not contest that the

involuntary transfer of inmates for purposes of mental health evaluation may reasonably advance

the legitimate correctional goal of protecting the safety and security of both prison staff and

inmates.

  Accordingly, Moulton is entitled to summary judgment on plaintiff's retaliation claim.

  **E.  Due Process Claim against Defendant Moulton**

  Plaintiff claims that Moulton violated his right to due process by referring him to the PSU

for a mental health evaluation without notice and an opportunity to be heard.

---

[5]  Moulton is not actually identified by name in plaintiff's July 19, 2011 grievance.  The grievance states only that the harassment by PBSP health care staff included an act committed "on 6/27/11 by the psychiatrist/psychologist doing his routine rounds."  (Dkt. No. 60-15 at 36-38.)  Plaintiff claims that because he did not know Moulton by name, he could only identify Moulton by title. (Pl. Decl. ¶ 9.)

United States District Court
Northern District of California

### 1.    Standard

Interests that are procedurally protected by the Due Process Clause may arise from two sources:  the Due Process Clause itself and laws of the states.  See Meachum v. Fano, 427 U.S. 215, 223-27 (1976).  In the prison context, these interests are generally ones pertaining to liberty. Changes in conditions so severe as to affect the sentence imposed in an unexpected manner implicate the Due Process Clause itself, whether or not they are authorized by state law.  See Sandin, 515 U.S. at 484 (citing Vitek v. Jones, 445 U.S. 480, 493 (1980) (transfer to mental hospital)); Washington v. Harper, 494 U.S. 210, 221-22 (1990) (involuntary administration of psychotropic drugs)).  A state may not impose such changes without complying with minimum requirements of procedural due process.  See Sandin at 484.

Deprivations that are authorized by state law and are less severe or more closely related to the expected terms of confinement may also amount to deprivations of a procedurally protected liberty interest, provided that (1) state statutes or regulations narrowly restrict the power of prison officials to impose the deprivation, i.e., give the inmate a kind of right to avoid it, and (2) the liberty in question is one of "real substance."  See id. at 477-87.  Generally, "real substance" will be limited to freedom from (1) a restraint that imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," id. at 484, or (2) state action that "will inevitably affect the duration of [a] sentence," id. at 487.  Whether a restraint is "atypical and significant" under Sandin requires a case by case consideration.  Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003).

### 2.    Discussion

The Court first determines whether plaintiff's transfer to the PSU for a mental health evaluation impinged on a liberty interest arising from the Due Process Clause.

Plaintiff argues that Vitek applies here because that case held that a convicted felon is entitled to procedures before he is found to have a mental disease and transferred to a mental hospital. (Pl. Opp. at 10.)  Plaintiff further asserts that the Vitek Court held that the "stigmatizing consequences" in involuntary transfer and psychiatric treatment "constitute the kind of deprivation of liberty that requires procedural protection."  (Pl. Opp. at 11.)  Vitek is distinguishable from the

18

instant case in at least two key respects.  First, unlike the plaintiff in <u>Vitek</u>, plaintiff here was not diagnosed with a mental illness; rather, he was referred for evaluation and observation to determine whether he might be suffering from such an illness.  Second, unlike the plaintiff in <u>Vitek</u>, plaintiff was not transferred to an outside mental hospital; rather, he remained at the same correctional facility but was temporarily housed in a different unit which provided specialized resources for evaluation.  (Moulton Decl. ¶ 8.)

Moreover, plaintiff omits a key element of <u>Vitek's</u> holding:  "[T]he stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, <u>coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness</u>, constitute the kind of deprivations of liberty that requires procedural protections."  <u>See Vitek</u>, 445 U.S. at 494 (emphasis added).  Contrary to plaintiff's assertion, the Court in <u>Vitek</u> did not hold that the stigma caused by involuntary transference constituted a deprivation of liberty under the Due Process Clause.  Rather, the Court held that the conjunction of stigmatization <u>and</u> mandatory behavior modification without procedural protections violated due process.

That this is the correct interpretation of <u>Vitek</u> follows from the well-established rule that stigmatization, standing alone, does not constitute a deprivation under the Due Process Clause. <u>See</u> <u>Paul v. Davis</u>, 424 U.S. 693, 701 (1976) ("While we have in a number of our prior cases pointed out the frequently drastic effect of the 'stigma' which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause."). Stigmatization caused by government action does not constitute a due process violation unless the stigma is accompanied "by either the denial of a right specifically secured by the Bill of Rights (such as the right to free speech or counsel), or the denial of a state-created property or liberty interest such that the Fourteenth Amendment's Due Process Clause is violated." <u>See</u> <u>Cooper v. Dupnik</u>, 924 F.2d 1520, 1532 n.22 (9th Cir. 1991).  This has become known as the "stigma-plus" test.  <u>Id.</u> at 1532.

Although <u>Vitek's</u> rationale did not incorporate a stigma-plus analysis, a number of courts

United States District Court
Northern District of California

1  have applied the stigma-plus test to § 1983 procedural due process claims filed by prisoners,

2  arrestees, detainees, parolees, and the like, where the plaintiffs alleged stigmatization as the

3  principal harm.  See, e.g., Humphries v. County of Los Angeles, 554 F.3d 1170, 1185 (9th Cir.

4  2008) (applying stigma-plus test to a § 1983 procedural due process claim filed by parents who

5  had been included in a state child abuse registry despite having been found factually innocent of

6  the charges for which they were arrested), overruled on other grounds by 562 U.S. 29 (2010); Rice

7  v. Michigan Dept. of Corr., No. 1:07-cv-578, 2007 WL 3471864, at *4 (W.D. Mich. Oct. 10,

8  2007) ("Vitek's due process protections are only triggered when there is a situation with a stigma-

9  plus-factor, such as stigma plus an involuntary transfer to a mental hospital and mandatory

10  treatment."), report and recommendation adopted (W.D. Mich. Nov. 13, 2007); Williams v.

11  Ballard, No. 3-02-cv-0270-M, 2004 WL 1499457, at *6 (N.D. Texas June 18, 2004) (finding the

12  stigma-plus-infringement test for procedural due process violations satisfied where a parolee who

13  had been classified as a sex offender was subjected to psychosexual counseling, including the

14  forced administration of smelling salts, as a condition of his parole), findings and

15  recommendations adopted, 2004 WL 2203250 (N.D. Tex. Sept. 30, 2004); Balentine v. Tremblay,

16  No. 5:11-cv-196, 2012 WL 1999859, at *5 (D. Vermont June 4, 2012) ("'Stigma plus' may be

17  found where an inmate is labeled mentally ill and transferred to a mental hospital without due

18  process." (citation omitted)).  Furthermore, when the stigma-plus test is applied to Vitek, it

19  becomes clear that the "plus factor" in that case was the inmate's subjection to mandatory behavior

20  modification:

21      It is indisputable that commitment to a mental hospital can engender adverse social
        consequences to the individual and that whether we label this phenomena "stigma" or
22      choose to call it something else . . . we recognize that it can occur and that it can have a
        very significant impact on the individual.  Also, among the historic liberties protected by
23      the Due Process Clause is the right to be free from, and to obtain judicial relief for,
        unjustified intrusions on personal security.  Compelled treatment in the form of mandatory
24      behavior modification programs, to which the District Court found [inmate] was exposed
        in this case, was a proper factor to be weighed by the District Court.
25

26  Vitek, 445 U.S. at 492 (ellipsis in original) (emphasis added) (citations and internal punctuation

27  omitted).  Consequently, the Court concludes that plaintiff's transfer to the PSU did not implicate a

28  liberty interest arising from the Due Process Clause itself.

The Court next turns to the question of whether plaintiff can show a due process violation based upon a state-created liberty interest.  After Sandin, courts analyzing prisoner due process claims based upon state-created liberty interests focus on whether the alleged deprivation imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  See, e.g ., Wilkinson v. Austin, 545 U.S. 209, 223 (2005) ("After Sandin, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" (quoting Sandin at 484)).  In Ramirez, the court identified three guideposts that provide a "helpful framework" for determining whether a prison hardship is "atypical and significant" under Sandin:

> 1) whether the challenged condition mirrored those conditions imposed upon inmates in administrative segregation and protective custody, and thus comported with the prison's discretionary authority; 2) the duration of the condition, and the degree of restraint imposed; and 3) whether the state's action will invariably affect the duration of the prisoner's sentence.

334 F.3d at 861 (internal quotation marks omitted).

In order to apply the Ramirez factors, the Court must inquire into the conditions of plaintiff's confinement in the PSU.  Unfortunately, what little can be gathered about the conditions of plaintiff's confinement in the PSU comes from a few remarks in plaintiff's declaration.  Plaintiff asserts that the inmates housed in the PSU were severely mentally ill individuals prone to throwing feces and urine at others and that he found it "extremely hard to adjust [to the PSU] and sleep soundly" because "the building was constantly loud as a result of the yelling and hollering and the banging of doors by EOP inmates."  (Pl. Decl. ¶ 38.)  He further asserts that he was asked to participate in various forms of psychological testing and weekly one-on-one sessions with his assigned clinician and that he felt compelled to fully participate in the program and cooperate with his assigned clinician because he feared that if he did not comply he would never be taken off the MHSDS.  (Pl. Decl. ¶¶ 39-40.)  On these facts, the Court finds that the first Ramirez factor weighs slightly in favor of plaintiff insofar as the conditions and consequences of plaintiff's confinement in the PSU were "qualitatively different from the punishment characteristically suffered by a

1   person convicted of crime."[6]  See Vitek, 445 U.S. at 493.

2      However, the Court finds that the second Ramirez factor weighs against plaintiff because

3   he was only in the PSU for thirty-five days and because the additional restraints and hardships

4   imposed upon him while there, though not trivial, do not constitute the sort of "grievous loss"

5   traditionally entitled to due process protection.  See Morrissey v. Brewer, 408 U.S. 471, 481

6   (1972) ("Whether any procedural protections are due depends on the extent to which an individual

7   will be condemned to suffer grievous loss." (citation and internal quotation marks omitted));

8   Keenan v. Hall, 83 F.3d 1083, 1089 (9th Cir. 1996) ("'The length of confinement cannot be

9   ignored in deciding whether the confinement meets constitutional standards.'" (quoting Hutto v.

10  Finney, 437 U.S. 678, 686-87 (1978))).  The Court also finds that the third Ramirez factor weighs

11  against plaintiff because his transfer to the PSU did not affect the duration of his sentence.  On

12  balance then, the Ramirez factors weigh against plaintiff, and the Court consequently concludes

13  that plaintiff fails to show that his transfer to the PSU was "atypical and significant."

14     Finally, even assuming the implication of a due process interest, for the reasons discussed

15  above, the prison policy allowing staff to refer inmates to the PSU for evaluation serves legitimate

16  penological interests.  See Turner v. Safley, 482 U.S. 78, 89 (1987) (prison regulations infringing

17  on an inmate's constitutional rights are valid so long as they are "reasonably related to legitimate

18  penological interests.")

19     Accordingly, Moulton is entitled to summary judgment on plaintiff's due process claim.

20  **F.      Qualified Immunity**

21     Defendants argue, in the alternative, that summary judgment is warranted because they are

22  entitled to qualified immunity.

23          **1.      Standard**

24     The defense of qualified immunity protects "government officials . . . from liability for

25  civil damages insofar as their conduct does not violate clearly established statutory or

26

27  _____

28  [6] The Court assumes for purposes of the Ramirez analysis that plaintiff's confinement in the PSU
    was not classified as administrative segregation.

United States District Court
Northern District of California

constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457

U.S. 800, 818 (1982).  The threshold question in qualified immunity analysis is:  "Taken in the

light most favorable to the party asserting the injury, do the facts alleged show the officer's

conduct violated a constitutional right?"  Saucier v. Katz, 533 U.S. 194, 201 (2001).  A court

considering a claim of qualified immunity must determine whether the plaintiff has alleged the

deprivation of an actual constitutional right and whether such right was "clearly established."

Pearson v. Callahan, 555 U.S. 223, 236 (2009) (overruling the sequence of the two-part test that

required determination of a deprivation first and then whether such right was clearly established,

as required by Saucier, and holding that a court may exercise its discretion in deciding which

prong to address first in light of the particular circumstances of each case).  Where there is no

clearly established law that certain conduct constitutes a constitutional violation, a defendant

cannot be on notice that such conduct is unlawful.  Rodis v. City of San Francisco, 558 F.3d 964,

970-71 (9th Cir. 2009).  The relevant, dispositive inquiry in determining whether a right is clearly

established is whether it would be clear to a reasonable officer that his conduct was unlawful in

the situation he confronted.  Saucier, 533 U.S. at 202.

   **2.**  **Discussion**

    **a.**  **Defendant Frisk**

   The Court has already determined that Frisk's use of force did not violate plaintiff's Eighth

Amendment right to be free from cruel and unusual punishment.  Thus, plaintiff fails to satisfy the

first prong of the Saucier analysis, and there is no need to inquire further into qualified immunity.

However, even assuming that Frisk's use of force was excessive, Frisk is nonetheless entitled to

qualified immunity under the second prong of Saucier because it was not clearly established at the

time of plaintiff's cell extraction that using two OCV grenades to extract an inmate from his cell

for purposes of a mental health evaluation violated the prisoner's right to be free from cruel and

unusual punishment.  The California Department of Corrections and Rehabilitation Department

Operations Manual ("CDCR DOM") clearly contemplates the use of chemical agents, including

OCV grenades, during controlled use of force incidents such as cell extractions.  See CDCR DOM

§§ 51020.12, 51020.12.3, 51020.15, 51020.15.1.  Further, a number of decisions within the Ninth Circuit have approved the use of multiple applications of chemical agents during cell extractions, see, e.g., Gaddy v. Solis, No. C 11-5568 PJH (PR), 2013 WL 5202590, at *2 (N.D. Cal. Sept. 16, 2013); Robins v. Lamarque, No. C 03-0797 JSW (PR), 2011 WL 6181435, at *5 (N.D. Cal. Dec. 13, 2011), and the Court is unaware of any cases holding that multiple applications of chemical agents such as OCV grenades, under facts similar to the present case, violate the Eighth Amendment.  Frisk could therefore reasonably have believed that deploying two OCV grenades against plaintiff to extract him from his cell did not violate the Eighth Amendment.  Accordingly, Frisk is entitled to qualified immunity on plaintiff's excessive force claim.

### b.     Defendant Moulton

### i.  Excessive Force

The Court has already determined that Frisk's use of force against plaintiff was not excessive and that, even assuming Frisk's use of force was excessive, Moulton is not liable for Frisk's use of force because Moulton did not have a reasonable opportunity to intervene.  Thus, plaintiff fails to satisfy the first prong of the Saucier analysis, and there is no need to inquire further into qualified immunity.  However, even assuming that Frisk's use of force was excessive and that Moulton had a duty to intervene, Moulton is entitled to qualified immunity under the second prong of Saucier because such a duty to intervene was not clearly established at the time of plaintiff's cell extraction.  Moulton performed a crisis intervention and then left plaintiff's cell after realizing that plaintiff could not be persuaded to voluntarily go to the PSU.  Although Moulton must have known at that point that a cell extraction team was being assembled and that they were likely to use force to extract plaintiff from his cell, Moulton could not have known that they would use excessive force against plaintiff.  The Court cannot say that under such circumstances Moulton had a clearly established duty to remain at plaintiff's cell just in case his intervention was needed to prevent the cell extraction team from using excessive force.  Moulton could reasonably have believed that after performing the crisis intervention, his duties or obligations toward plaintiff vis-à-vis plaintiff's upcoming cell extraction were at an end.  Accordingly, Moulton is entitled to

United States District Court
Northern District of California

qualified immunity on plaintiff's excessive force claim.

### ii.  Retaliation Claim

The Court has already determined that Moulton did not retaliate against plaintiff for engaging in conduct protected by the First Amendment.  Thus, plaintiff fails to satisfy the first prong of the Saucier analysis, and there is no need to inquire further into qualified immunity. Further, the undisputed facts show that Moulton's only involvement was to attempt to conduct an evaluation of plaintiff and to sign a mental health placement chrono after Moulton's superiors had already decided to refer plaintiff to the PSU.  It would not have been apparent to a reasonable officer that these acts could somehow qualify as retaliatory.  Accordingly, Moulton is entitled to qualified immunity on plaintiff's retaliation claim.

### iii.  Due Process Claim

The Court has already determined that plaintiff's involuntary transfer to the PSU for a thirty-five day mental health evaluation did not violate due process.  Thus, plaintiff fails to satisfy the first prong of the Saucier analysis, and there is no need to inquire further into qualified immunity.  However, even assuming that plaintiff's involuntary transfer to the PSU violated due process, it was not clearly established at the time of plaintiff's transfer that such a transfer implicated a liberty interest requiring due process protections.  Moulton and the other PBSP staff members who referred plaintiff to the PSU could reasonably have believed that it was constitutionally permissible to involuntarily transfer plaintiff to the PSU for a thirty-five day mental health evaluation without affording him procedural protections.  Accordingly, Moulton is entitled to qualified immunity on plaintiff's due process claim.

### CONCLUSION

For the foregoing reasons, the Court orders as follows:

1.    Plaintiff's motion for reconsideration (Dkt. No. 51) is DENIED.

2.    Defendants' motion for summary judgment (Dkt. No. 60) is GRANTED as to all claims.

3.    Plaintiff's first motion to supplement his opposition to address pendent state law

United States District Court
Northern District of California

claims (Dkt. No. 81) is DENIED as moot.  The Court declines to exercise supplemental

jurisdiction over any pendent state law claims now that the federal claims have been resolved in

defendants' favor.  <u>See</u> 28 U.S.C. § 13679(c)(3).  Plaintiff may pursue any remaining state law

claims in state court.

    4.    Defendants' motion to strike plaintiff's sur-reply (Dkt. No. 83) is DENIED as moot.

    4.    The Clerk shall terminate all pending motions, enter judgment in favor of

defendants, and close the file.

    **IT IS SO ORDERED.**

Dated:  September 25, 2014

_____
JON S. TIGAR
United States District Judge